

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARILU CHAVEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 06 C 2180 |
| v. | ) |
| | ) Judge Ruben Castillo |
| RICHARD GUERRERO, CITY OF | ) |
| CHICAGO and JOHN DOES 1-10, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marilu Chavez ("Chavez") brought this action against Chicago police officer Richard Guerrero ("Guerrero"), the City of Chicago ("the City"), and certain unnamed defendants from the Chicago Police Department ("CPD"). Defendant Guerrero has filed a motion to dismiss the claims raised against him. For the reasons set forth below, Guerrero's motion is granted in part and denied in part.

## RELEVANT FACTS[1]

This federal civil rights case is based on a series of unusual alleged facts. Around 8:30 a.m. on April 19, 2005, Chavez was involved in a traffic accident near the intersection of Walton and Leavitt Streets in Chicago, Illinois. (R. 21-1, Pl.'s Second Am. Compl. ¶ 8.) A police officer arrived at the scene and directed Chavez to proceed to the police station at 937 N. Wood

---

[1] These facts are taken from Plaintiffs' Second Amended Complaint (R-21-1). For purposes of the motion to dismiss, the Court must accept the complaint's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor. *Dawson v. Newman*, 419 F.3d 656, 658 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 2026 (2006).

1

Street to fill out a report. (*Id.*) Chavez called her father, who met her at the accident scene and drove her to the police station. (*Id.*)

At the police station, an officer took Chavez's personal information, filled out a police report, and issued her traffic tickets for the accident. (*Id.* ¶ 9.) During this time Chavez was distraught and crying because she was upset about the accident. (*Id.*) When the report was completed Chavez went to the front of the police station to sign some papers regarding a future court appearance. (*Id.*) While she was signing the papers she saw Guerrero, who motioned for her to come over and see him. (*Id.*) She ignored him. (*Id.*) Guerrero moved to another area of the station and continued to motion to Chavez, but she again ignored him. (*Id.*)

Chavez thereafter left the station with her father. (*Id.*) She was still upset and crying when she left the station. (*Id.*) Guerrero left the station at the same time as Chavez and her father, and proceeded to follow them for several blocks in a marked police car. (*Id.* ¶ 10.) At one point Guerrero pulled up alongside the car and motioned for Chavez to roll her window down, but she again ignored him. (*Id.*) Guerrero then returned to the police station and accessed the police report regarding Chavez's accident, retrieving her phone number from the report. (*Id.* ¶ 11.)

Around 10:30 a.m. that same day, Chavez arrived at work. (*Id.* ¶ 12.) Around 11:00 a.m. she received a call on her cellular phone. (*Id.*) The caller identified himself as Rick, the man who had been trying to get her attention at the police station. (*Id.*) Guerrero told Chavez that he felt they had a connection, that they belonged together, and that she should "let him help her." (*Id.*) Chavez interpreted this last comment to mean that Guerrero was offering to assist her in some way with the traffic accident. (*Id.*) Chavez told Guerrero to stop calling her and hung up

the phone. (*Id.*)

Guerrero immediately called back. (*Id.* ¶ 13.) Chavez asked him how he had obtained her phone number, and he said he got it from the police report. (*Id.*) Guerrero asked Chavez what she did for a living, and she told him that she was a travel agent. (*Id.*) Guerrero stated that he had always wanted to go to Italy. (*Id.*) Chavez said her office could assist him with travel arrangements. (*Id.*) Guerrero then asked Chavez when she would have time off work. (*Id.*) He recited her address and said he would come to her house with a bottle of wine to talk about the trip to Italy. (*Id.*) Realizing that Guerrero was not interested in her professional services, Chavez told him to stop calling and hung up the phone. (*Id.*)

Over the next few hours, Guerrero called Chavez approximately thirteen times. (*Id.* ¶ 14.) Each time Guerrero called, Chavez immediately hung up the phone. (*Id.*) The last time Guerrero called, Chavez answered and told him to stop calling. (*Id.*) Every call but one came up as "private" on Chavez's caller identification. (*Id.*) The one time the phone number of the caller was displayed on Chavez's phone, she wrote it down. (*Id.*) Chavez alleges that Guerrero was on duty as a Chicago police officer during this entire time period, including when he made the phone calls to her and followed her father's car. (*Id.* ¶ 15.)

Around 6:30 p.m. that night, Chavez returned to the police station to complain about Guerrero's phone calls. (*Id.* ¶ 16.) After she explained the situation to the officers at the front desk, they acted as if she were making a joke. (*Id.*) She demanded to speak to someone in charge and ultimately spoke with Sergeant Marsala.[2] (*Id.* ¶ 17.) She explained to him about the calls she had received. (*Id.*) Although she did not know Guerrero's last name at the time, she

---

[2] The parties have not provided the Court with Sergeant Marsala's first name.

told Sergeant Marsala that she had obtained a phone number from the caller identification on her phone. (*Id.* ¶ 18.) Sergeant Marsala suggested that she call the number to try to obtain the last name of the caller. (*Id.*)

Chavez called the number but no one answered. (*Id.*) After she hung up, however, Guerrero immediately called her back. (*Id.*) When Chavez answered her phone, she asked who was calling, and the caller said "Rick." (*Id.*) Chavez asked, "Rick who?" The caller replied that it was Rick Guerrero. (*Id.*) Chavez thereafter told Sergeant Marsala the last name of the person who had been calling her. (*Id.*) Sergeant Marsala informed Chavez that Rick Guerrero was a police lieutenant who worked the day shift. (*Id.*) He also told Chavez that he would report her complaint to his commander. (*Id.*) Chavez thereafter left the station. (*Id.*)

The following day, April 20, 2005, at about 10:30 a.m., two unknown Chicago police officers came to Chavez's place of employment and requested that she accompany them to the police station to discuss the complaint she had made about Guerrero. (*Id.* ¶ 19.) She told them she was unable to leave work at that time, and so they stayed at her office and waited for her until 6:30 p.m. when her shift ended. (*Id.* ¶ 20.) She then went with them to the police station, where she was detained for several hours. (*Id.* ¶¶ 22-24.) At one point she requested that she be allowed to leave the station to have a cigarette, but the officers denied her request and prohibited her from leaving. (*Id.* ¶ 24.) She was repeatedly told that she was being held in order to witness a line-up, but no line-up ever occurred. (*Id.* ¶¶ 25-26.) Guerrero's father was also brought to the police station around 6:30 p.m. that same night. (*Id.* ¶ 27.) The two were separated and were not allowed to talk to each other while they were at the station. (*Id.* ¶¶ 28-29.) They were ultimately released around 3:00 a.m. the next day. (*Id.* ¶ 24.)

Since this incident Chavez claims to have been "continuously harassed" by Chicago police officers. (*Id.* ¶ 30.) According to the complaint, she has been followed by police cars on several occasions and has had garbage thrown on her car several times, including around the time she was due to testify in a state criminal proceeding initiated against Guerrero. (*Id.* ¶¶ 31-35.) Guerrero was ultimately found guilty of misdemeanor telephone harassment in state court and was sentenced to a year of court supervision. (*Id.* ¶ 37.)

Chavez alleges that the CPD's Internal Affairs Division investigated Guerrero on similar charges of harassment on two prior occasions. (*Id.* ¶ 38.) She alleges that he was disciplined but was not terminated nor transferred to a position where he could not access information regarding females who had contact with the police department. (*Id.*) As a result of the events described in the complaint, Chavez claims to have suffered severe mental and emotional damage, including fear, humiliation, anxiety, and lost enjoyment of life. (*Id.* ¶ 39.)

## PROCEDURAL HISTORY

On April 19, 2006, Chavez filed this action. She has since filed two amended complaints; the operative complaint for purposes of this motion is the Second Amended Complaint filed on September 20, 2006. (R. 21-1.) In Count I, Chavez alleges that Guerrero violated her constitutional rights to privacy and equal protection in violation of 42 U.S.C. § 1983 when he obtained her telephone number from a police record and began to pursue her romantically. In Counts II and III she raises federal constitutional claims against the unknown police officers who detained her in connection with the complaint she made about Guerrero's conduct. In Count IV, Chavez asserts a state law claim against Guerrero for intentional infliction of emotional distress. In Count VI, Chavez asserts a state law indemnification clam against the

City of Chicago, asserting that because Guerrero was acting in the scope of his employment as a city police officer during these events, the City is liable for her damages.[3]

Before the Court is Guerrero's motion to dismiss the claims raised against him, Counts I and IV. He moves for dismissal of Count I pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that even accepting all of Chavez's allegations as true, he was not acting under color of state law during the events described in the complaint and therefore cannot be sued under § 1983. He also seeks dismissal of Count IV, the pendent state law claim for intentional infliction of emotional distress, arguing that if the federal constitutional claim is dismissed, there is no basis for this Court to retain jurisdiction over the state law claim.

## LEGAL STANDARDS

In considering a motion to dismiss, the Court must accept the complaint's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in Chavez's favor. *Dawson,* 419 F.3d 656 at 658. The Court will grant a motion to dismiss only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Phelan v. City of Chicago,* 347 F.3d 679, 681 (7th Cir. 2003).

## ANALYSIS

### I. Count I

To state a claim under § 1983, a plaintiff must allege that he or she was (1) deprived of a federal right, privilege, or immunity (2) by a person acting under color of state law. *West v.*

---

[3] In Count V Chavez raised a negligent supervision claim against the City of Chicago. On October 11, 2006, Chavez agreed to voluntarily dismiss this claim in response to a motion to dismiss filed by the City. (R. 26, 42.) Accordingly, the Court dismissed Count V without prejudice and denied the City's motion to dismiss Count V as moot. (R. 42.)

*Atkins*, 487 U.S. 42, 49-50 (1988). The "under color of state law" requirement is met if the defendant acted in an official capacity as a public employee or exercised responsibilities pursuant to state law. *Id.* at 50. State employment by itself is not conclusive of whether a defendant acts under color of state law; rather, the conduct that forms the basis of the complaint must be related to the defendant's state-conferred authority. *See Polk County v. Dodson*, 454 U.S. 312, 321 (1981); *Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990); *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). Whether a defendant acted under color of state law is a question of law for the court; however, a jury question may be presented if there are unanswered questions of fact regarding the proper characterization of the defendant's actions. *See Gibson*, 910 F.2d at 1517.

Although most police officers are state officials for purposes of § 1983, the mere fact that the defendant is a police officer does not mean that he or she acted under color of state law. As the Seventh Circuit has held, "Acts committed by police officers even while on duty and in uniform are not under color of state law unless they are in some way related to the performance of police duties." *Gibson*, 910 F.2d at 1516-17. Acts of police officers "in the ambit of their personal, private pursuits" are outside the scope of § 1983. *Id.* at 1517. On the other hand, the acts of officers "who undertake to perform their official duties are included [within § 1983] whether they hew to the line or overstep it." *Id.* at 1518. In determining whether a police officer is acting under color of law or is instead engaged in a private pursuit, "[i]t is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law." *Id.* at 1517; *see also Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) ("Deciding whether a police officer acted

7

under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties.").

The question then becomes whether Guerrero's actions, as alleged, were related in some way to the performance of his police duties.[4] The allegations in the complaint reveal as follows: Chavez first encountered Guerrero when she was at the police station filling out paperwork. He motioned for to her to come and see him. (R. 21-1, Pl. Second Am. Compl. ¶ 12.) There is nothing in the complaint to suggest Guerrero indicated to Chavez that he wanted to speak with her about official police business; in fact, Chavez simply ignored Guerrero when he motioned to her and ultimately left the station without speaking to him. At no time did Guerrero command Chavez to speak with him, prevent her from leaving the station, or otherwise invoke his authority as a police officer during their interactions.

Guerrero subsequently called Chavez on her cell phone, identifying himself as Rick, the man who had tried to get her attention at the police station. He did not identify himself as "Officer Guerrero" or otherwise indicate that he was calling on official police business. Instead he told Chavez that he was calling because "he felt they had a connection and belonged together." (*Id.*) In subsequent calls he asked her when she would have time off work and

---

[4] Contrary to Guerrero's argument, whether he was acting within the "scope of employment" is not a factor to be considered in the context of the § 1983 claim raised against him. *See Coles v. City of Chicago*, 361 F. Supp. 2d 740, 746 (N.D. Ill. 2005) (explaining that under color of state law and scope of employment inquiries "should not be confused"). The under color of law requirement is necessary to impose liability against an individual police officer, while the scope of employment requirement is necessary to hold the individual officer's employer—in this case the City of Chicago—responsible for the plaintiff's damages pursuant to 745 ILCS 10/9-102. *See Coleman v. Smith*, 814 F.2d 1142, 1147 (7th Cir. 1987); *Coles*, 361 F. Supp. 2d at 746. The issue of the City's liability under 10/9-102 is not presently before the Court.

8

proposed bringing a bottle of wine to her house so that the two could discuss a trip to Italy. (*Id.*) These statements were obviously not related to the performance of Guerrero's police duties. *See Murphy v. Chicago Transit Auth.*, 638 F. Supp. 464, 468 (N.D. Ill. 1986) (Chicago Transit Authority attorneys were not acting under color of state law when they made sexual comments to co-worker because "humiliating comments and harassing behavior had nothing to do with, and bore no similarity to, the nature of the staff attorney job").

Even if we assume, as Chavez suggests, that during these conversations Guerrero made reference to his job as a police officer by hinting that he could help her with the traffic accident, we do not find this sufficient to show he was acting under color of state law. *See Gibson*, 910 F.2d at 1516 ("a mere assertion that one is a state officer does not necessarily mean that one acts under color of state law"); *Vanderlinde v. Brochman*, 792 F. Supp. 52, 55-56 (N.D. Ill. 1992) (fire fighters involved in bar fight were not acting under color of state law even though they displayed their badges and told plaintiff they were "the law in Oak Lawn" during incident).

Similarly, although Guerrero allegedly followed Chavez in a marked police car after she left the police station, the fact that he was in a police car or on duty at the time of the incident is not determinative. *See Gibson*, 920 F.2d at 1517; *Lyons v. Adams*, 257 F. Supp. 2d 1125, 1132-33 (N.D. Ill. 2003). Rather, it the nature of the act he performed, and whether that act was related to his official duties, that is critical. According to the complaint, Guerrero did not turn on the siren or lights in the police car, order Chavez to pull over, or take any other action invoking his authority as a police officer or suggesting that he was engaged in the performance of official police duties. Instead, he pulled up next to Chavez and motioned for her to roll down the window. (*Id.* ¶ 10.) She ignored him and the incident proceeded no further. (*Id.*) Guerrero thus

9

acted no differently than a private citizen might have acted—however inappropriately—to get someone's attention. *See Lyons*, 257 F. Supp. 2d at 1133 (finding defendant officers did not act under color of state law because their "actions in the fight are indistinguishable from those of private actors that have engaged in a brawl"); *Zienciuk v. City of Chicago*, No. 01cv3769, 2002 WL 1998309 at *6 (N.D. Ill. Aug. 28, 2002) (observing that defendant police officers were not acting under color of state law during bar fight because "they behaved the same way non-police officers would behave").

The cases relied on by Chavez to support her argument that Guerrero was acting under color of state law are distinguishable from the instant case. For instance, in *Pickrel*, the defendant, a private security guard who was also employed as a full-time police officer, threatened to arrest the plaintiff if she did not leave a restaurant. 45 F.3d at 1117. When the plaintiff refused, the defendant threw her to the ground, put handcuffs on her, and arrested her. *Id.* Similarly, in *Coles*, the defendant was an off-duty police officer who got into an altercation with a nightclub patron. 361 F. Supp. 2d at 742-43. The defendant announced that he was a police officer, assisted the nightclub security guards in restoring order, and then allegedly shot the plaintiff. *Id.* at 749. In both cases the courts found sufficient facts to demonstrate that the defendants had acted under color of state law.

Unlike the defendant police officers in *Pickrel* and *Coles*, however, Guerrero is not alleged to have taken any actions that would be associated with the performance of police duties, such as using physical force against Chavez, handcuffing her, or arresting her. At no time did Guerrero indicate to Chavez that he was performing official police duties, nor did he exercise his official authority in his contact with her. Indeed, it is apparent from the pleadings that Chavez

understood Guerrero was not pursuing her in regards to any official police business throughout these events: She repeatedly ignored him when he motioned to her at the police station; she ignored him when he followed her in his car and asked her to roll down her window; and she hung up on him when he called her. (*Id.*) Undoubtedly she would have reacted differently had Guerrero invoked his authority as a police officer or made a show of force during their interactions. Additionally, although Chavez is alleged to have obtained Chavez's phone number from a police report, Chavez herself acknowledges that Guerrero did so "for his own sexual gratification." (R. 21-1, Compl. ¶ 42).

In sum, the allegations regarding Chavez's interactions with Guerrero demonstrate that his actions were not related to the performance of police duties. Instead, he was engaged in a purely private pursuit fueled by his romantic interest in Chavez. While we are disturbed by allegations that a police officer would engage in this type of conduct, we find that Guerrero's actions fall outside the scope of § 1983. Accordingly, we dismiss Count I of the complaint with prejudice.

## II.   Count IV

Guerrero further argues that if we dismiss the federal constitutional claim raised against him, we should also dismiss the intentional infliction of emotional distress claim for lack of subject matter jurisdiction. Pursuant to 28 U.S.C. § 1367(a), when the court has original jurisdiction over a federal claim, the court also has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). When the claim over which the court has original jurisdiction is dismissed, the court may, but is not required to, dismiss the

related state law claims. *See* 28 U.S.C. § 1367(c)(3); *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005).

Even though we have dismissed Chavez's federal claim raised against Guerrero, the federal claims she raises in Counts II and III against the unnamed police officer defendants remain pending. The facts underlying these claims are intertwined, in that all three claims arise from the series of events related to Guerrero's alleged harassment of Chavez. We believe that the interests of judicial economy would be served by having these claims decided together. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988) (in deciding whether to exercise pendent jurisdiction the court should consider "values of judicial economy, convenience, fairness and comity," which underlie pendent jurisdiction doctrine). Therefore, we will exercise our discretion to retain jurisdiction over Chavez's state law claim against Guerrero and, accordingly, Guerrero's motion to dismiss Count IV is denied.

## CONCLUSION

For the foregoing reasons, Defendant Guerrero's motion to dismiss (R. 23) is granted as to Count I and denied as to Count IV.

The parties are directed to reevaluate their settlement positions in light of this ruling and to exhaust all efforts to settle this case. A status hearing will be held in open court on **January 18, 2007** at **9:45 a.m.**, at which time counsel shall be prepared to report on the status of settlement discussions.

Entered: _____
**Judge Ruben Castillo**
**United States District Court**

**Dated: December 15, 2006**

12